*Arizona Precious Metals, Inc. v. Accept Erste Rohstoff Beteiligungs KG, a German Limited Partnership; Karl-Heinz Rauball and Jane Doe Rauball, his wife; Bernhard Puttke and Jane Doe Puttke, his wife; Kurt Schaller and Jane Doe Schaller, his wife*, cause number CV 07-707-PHX-MHB

Declaration of Dr. Johannes Hermann Hüning

## DECLARATION OF DR. JOHANNES HERMAN HÜNING UNDER THE PENALTY OF PERJURY

The undersigned Declarant, being first duly sworn upon oath, deposes and says as follows:

1. My name is Dr. Johannes Hermann Hüning; I make this Affidavit based upon my own knowledge and information; and

2. I am a tax attorney and accountant (Steuerberater) licensed to practice tax law in the Country of Germany; I have held a tax lawyer license (Steuerberater) there since 1966; and

3. I am the President and Chairman of the Board of Directors of Arizona Precious Metals, Inc., ("APM") the Plaintiff in United States District Court, District of Arizona, litigation captioned *Arizona Precious Metals, Inc. v. Accept Erste Rohstoff Beteiligungs KG, a German Limited Partnership; Karl-Heinz Rauball and Jane Doe Rauball, his wife; Bernhard Puttke and Jane Doe Puttke, his wife; Kurt Schaller and Jane Doe Schaller, his wife*, cause number CV 07-707-PHX-MHB; and

4. APM is a Nevada Corporation authorized to and conducting its activities in Maricopa County, State of Arizona; and

5. The Senator Fuer Justiz in Berlin served Defendant Karl-Heinz Rauball on May 10, 2007, as stated in the Certificate/Attestation previously submitted to the Court; and

6. The Senator Fuer Justiz in Berlin served Defendant Bernhard Puttke on May 10, 2007, as stated in the Certificate/Attestation previously submitted to the Court; and

7. The Senator Fuer Justiz in Berlin served Defendant Accept Erste Rohstoff Beteiligungs KG, a German Limited Partnership on May 18, 2007, as stated in the Certificate/Attestation previously submitted to the Court; and

8. On August 22, 2006, APM and the Silver King Mining Company of Arizona ("SKM") entered into the APM – SKM Joint Venture Agreement ("APM-SKM JVA") whereby SKM contributed its mining rights to the Silver King Mine along with certain equipment, and APM agreed to provide the financing necessary to commence production. *See* Exhibit "1" appended hereto and by

*Arizona Precious Metals, Inc. v. Accept Erste Rohstoff Beteiligungs KG, a German Limited Partnership; Karl-Heinz Rauball and Jane Doe Rauball, his wife; Bernhard Puttke and Jane Doe Puttke, his wife; Kurt Schaller and Jane Doe Schaller, his wife, cause number CV 07-707-PHX-MHB*

Declaration of Dr. Johannes Hermann Hüning

this reference made a part hereof. APM became a 60% interest holder in the Joint Venture, and SKM became a 40% interest holder; and

9. APM's promise to provide the start up capital for the APM-SKM JV was based on a promise made to APM by Messrs. Schaller, Rauball and Puttke that they would cause Accept to fund APM with a $2,000,000 loan; and

10. Effective September 5, 2006, Accept executed a Loan ("Loan Agreement") *See* Exhibit "B". The Loan Agreement provided for a series of loan payments culminating in a $2M funding to APM; and

11. The Loan Agreement was arranged through Messrs. Schaller, Rauball and Puttke. In exchange for the execution of the Loan Agreement by Accept, Messrs. Schaller, Rauball and Puttke received the following contingent interests in APM: Karl-Heinz Rauball, 625,000 shares of APM stock; Bernhard Puttke, 625,000 shares of APM stock; Kurt Schaller, 1,250,000 shares of APM stock. In addition, Messrs. Schaller, Rauball and Puttke each received contingent stock options equal to 20% of their contingent holding; and

12. Declarant has learned through telephonic and in-person conversations with Messrs. Schaller, Rauball and Puttke that Accept was a newly formed German Limited Partnership organized, in part, to make the loan to APM; and

13. Messrs. Schaller, Rauball and Puttke made independent promises to fund the $2M loan; and

14. By virtue of the acceptance of direct contingent stock ownership by Messrs. Schaller, Rauball and Puttke in exchange for the execution of the Loan Agreement by Accept, there was a unity of interest between Accept and Messrs. Schaller, Rauball and Puttke with respect to the Loan Agreement; and

15. The separate personalities of Accept and Messrs. Schaller, Rauball and Puttke have ceased to exist with respect to the Loan Agreement; and

16. To observe the corporate or other separateness of Accept from Schaller, Rauball and Puttke would be unjust since Accept is a single purpose newly formed German Limited Partnership with no apparent funds of its own; and

*Arizona Precious Metals, Inc. v. Accept Erste Rohstoff Beteiligungs KG, a German Limited Partnership; Karl-Heinz Rauball and Jane Doe Rauball, his wife; Bernhard Puttke and Jane Doe Puttke, his wife; Kurt Schaller and Jane Doe Schaller, his wife,* cause number CV 07-707-PHX-MHB

Declaration of Dr. Johannes Hermann Hüning

17. Following Messrs. Schaller's, Rauball's and Puttke's independent promise to arrange and fund the loan, Declarant held numerous conversations with Messrs. Schaller, Rauball and Puttke regarding the funding of the loan; and

18. Declarant's conversations with Messrs. Schaller, Rauball and Puttke occurred by telephone and in person; and

19. Declarant traveled to Germany on several occasions to discuss the status of the loan with Messrs. Schaller, Rauball and Puttke; and

20. During telephonic and in-person conversations with Messrs. Schaller, Rauball and Puttke, Declarant learned that the promises to make the loan on or about September 5, 2006, were made knowingly that the loan could not be made by Defendants; and

21. Declarant also learned during telephonic and in-person conversations with Messrs. Schaller, Rauball and Puttke that at the time Messrs. Schaller, Rauball and Puttke made the promise to make the loan on or about September 5, 2006, Messrs. Schaller, Rauball and Puttke knew that they did not have the means to make the loan; and

22. In Declarant's and APM's dealings with SKM, Declarant and APM relied on Messrs. Schaller, Rauball and Puttke's implied statement and promise that they could make the loan as agreed; and

23. Between the time of execution of the Loan Agreement and the time of this Affidavit, Defendants kept reassuring Declarant that funding in one form or another would be forthcoming, only to meet with repetitive breaches and failures; and

24. Messrs. Schaller, Rauball and Puttke breached their agreement to fund the Loan to APM through Accept; and

25. As a direct and proximate result of Accept's and Messrs. Schaller's, Rauball's and Puttke's failure to make the loan as agreed, APM has incurred damages for loss of income and profits as follows:



*Arizona Precious Metals, Inc. v. Accept Erste Rohstoff Beteiligungs KG, a German Limited Partnership; Karl-Heinz Rauball and Jane Doe Rauball, his wife; Bernhard Puttke and Jane Doe Puttke, his wife; Kurt Schaller and Jane Doe Schaller, his wife,* cause number CV 07-707-PHX-MHB

Declaration of Dr. Johannes Hermann Hüning

| Silver King Mine Joint Venture Income Projections* | | | | |
| --- | --- | --- | --- | --- |
| Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| Gross income     15,120,000 | 14,000,000 | 15,000,000 | 15,600,000 | 16,200,000 |
| Gross profit/ | | | | |
| EBITDA          11,092,350 | 9,726,542 | 10,464,269 | 10,861,783 | 11,254,032 |
| 60% EBIT to APM 6,637,182 | 5,815,874 | 6,256,506 | 6,492,808 | 6,725,731 |
| 40% EBIT to SKM 4,424,788 | 3,877,250 | 4,171,004 | 4,328,539 | 4,483,821 |
| NPV Factor          0.83 | 0.69 | 0.58 | 0.48 | 0.40 |
| **APM        (npv) 5,508,861** | **4,012,953** | **3,628,773** | **3,116,547** | **2,690,292** |
| SKM        (npv) 3,672,574 | 2,675,302 | 2,419,182 | 2,077,698 | 1,793,528 |
| Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
| Gross income     16,200,000 | 16,200,000 | 16,200,000 | 16,200,000 | 16,200,000 |
| Gross profit/ | | | | |
| EBITDA          11,254,032 | 11,254,032 | 11,254,032 | 11,254,032 | 11,254,032 |
| 60% EBIT to APM 6,725,731 | 6,725,731 | 6,725,731 | 6,725,731 | 6,725,731 |
| 40% EBIT to SKM 4,483,821 | 4,483,821 | 4,483,821 | 4,483,821 | 4,483,821 |
| NPV Factor          0.33 | 0.28 | 0.23 | 0.19 | 0.16 |
| **APM        (npv) 2,219,491** | **1,883,204** | **1,546,918** | **1,277,888** | **1,076,116** |
| SKM        (npv) 1,479,660 | 1,255,469 | 1,031,278 | 851,925 | 717,411 |

\* The Discount rate for a private business is calculated at 20% in accordance with "How To Value Your Business and Increase its Potential" Author Jay B., Abrams, page 82.  ISBN: 0-07-139520-2

26. Reducing the loss of income and profits to present value yields the present value of damages in the amount of US$ 26,961,043.

27. Defendants induced APM to enter into the Loan Agreement having no ability or intent to perform thereunder; and

28. APM justifiably relied on Defendants that the Loan Agreement would be performed pursuant to its terms; and

29. During telephonic and in-person conversations with Defendants Messrs. Schaller, Rauball and Puttke, Declarant has learned that Messrs. Schaller, Rauball and Puttke each or as a group hold significant assets and holdings in Germany and across the globe, as follows:

   a. Interest in up to 1% commission for the sale of 30 Airbus 300 Series airplanes to the Republic of Congo and other countries and/or their airlines valued at $1.8 billion; and

   b. Mining interests in Indonesia valued at several million US Dollars; and

*Arizona Precious Metals, Inc. v. Accept Erste Rohstoff Beteiligungs KG, a German Limited Partnership; Karl-Heinz Rauball and Jane Doe Rauball, his wife; Bernhard Puttke and Jane Doe Puttke, his wife; Kurt Schaller and Jane Doe Schaller, his wife, cause number CV 07-707-PHX-MHB*

Declaration of Dr. Johannes Hermann Hüning

    c. Three oils concessions and several mining claims for diamonds and precious metals in the Republic of Congo valued at several million US Dollars.

30. Defendant Puttke's and Rauball's fraud in the inducement and their breach of implied covenant of good faith and fair dealing were committed with a willful or wanton disregard of the interests of the APM; and

31. Declarant, on behalf of Plaintiff, submits that punitive damages should be assessed against each Defendant, including Defendant Puttke, jointly and severally with others, in the amount of $5,000,000.00 in order to punish Defendants, including Defendant Puttke and Rauball, and to deter others from engaging in similar misconduct.

32. Based on the foregoing, Declarant submits that the following damages were incurred by Arizona Precious Metals, Inc. as a direct and proximate result of Defendants' breaches of contract and fraud in the inducement:

| | |
|---|---|
| Actual Damages: | $26,961,043.00 |
| Reasonable Punitive Damages: | $5,000,000.00 |

The Declarant has reviewed the foregoing and knows the contents thereof, and declares under the penalty of perjury that the foregoing is true and correct to the best of his personal knowledge, information and belief.

DATED this 9ᵗʰ day of August, 2007.


Dr. Johannes H. Hüning
Declarant

*Master 8/22/06*

Arizona Precious Metals – Silver King Joint Venture Agreement

# JOINT VENTURE AGREEMENT
## OF
## ARIZONA PRECIOUS METALS – SILVER KING
### An Arizona Joint Venture

THIS JOINT VENTURE AGREEMENT is entered into this 22 day of August, 2006, for good and valuable consideration the sufficiency of which is hereby expressly confirmed, by and among Silver King Mining Company of Arizona, LLC, and Arizona Limited Liability Company ("Silver King") and Arizona Precious Metals, Inc., a Nevada Corporation ("APM") for the purposes and on the terms set forth below.

## RECITALS

WHEREAS, the parties are desirous of forming a joint venture (the "Venture"), under the laws of the State of Arizona by execution of this Joint Venture Agreement for the purpose set forth herein and are desirous of fixing and defining between themselves their respective responsibilities, interests, and liabilities in connection with the purposes set forth above; and

WHEREAS, Silver King owns a working precious metals mine and a known precious metals ore body in the environs of Superior, Arizona, commonly known as the Silver King Mine and the El Medico mining claims and operations ("Mining Operations");

WHEREAS, Silver King owns mining and/or mineral rights to known and unknown precious metals ore bodies in an area of Superior, Arizona, consisting of approximately 5 acres within a twenty-acre unpatented mining claim approximately three miles north of the town of Superior, Arizona, (see section III A. 6. Project Area in the Plan of Operations for Mining Activities On National Forest System Lands. Silver King Mine 2004); and

WHEREAS, Silver King desires to (1) install additional equipment at the Mining Operations; (2) Bring the Mining Operations to production status; (3) Continue exploration of Unexplored Ore Bodies; (4) Expand its production at the Mining Operations; and (5) Mine and concentrate Unexplored Ore Bodies ("Silver King Projects"); and

WHEREAS, APM has the ability to aid Silver King to fulfill Silver King Projects; and

WHEREAS, Silver King and APM wish to enter into a joint venture for the purpose of mining, concentrating, refining and hallmarking precious metals.

NOW, THEREFORE, in consideration of the mutual covenants and promises herein contained, the Parties herein agree to constitute themselves as joint venturers, henceforth, "Venturers" for the purposes herein mentioned, and intending to be legally bound hereby, the parties hereto covenant, agree and certify as follows:

SKM: _____

APM: _____

SKM – APM JVA
Page 1

# EXHIBIT 1

Arizona Precious Metals – Silver King Joint Venture Agreement

## JOINT VENTURE AGREEMENT

1) **DEFINITIONS**

a) "Affiliate" shall mean (i) any person directly or indirectly controlling, controlled by or under common control with another person, (ii) any person owning or controlling 10% or more of the outstanding voting securities of such other person, (iii) any officer, director or other partner of such person and (iv) if such other person is an officer, director, joint venturer or partner, any business or entity for which such person acts in any such capacity.

b) "APM" shall mean Arizona Precious Metals, Inc., a Nevada Corporation.

c) "Authorized Persons" shall mean those directors, officers, managers, agents, or independent consultants of any Contracting Party who are authorized by such Contracting Party to obtain Confidential Information in order to evaluate a prospective business relationship or to carry out any business relationship which may be established by or among the Contracting Parties.

d) "Concentrate" shall mean concentrates produced and to be produced at the Silver King Mine.

e) "Confidential Information" shall mean any and all information concerning, related to, or referencing any business relationship currently existing or contemplated by any Contracting Party; any client or customer relationship including the identity of such client or customer, any customer or client list, and any customer or client information; the identity of any Person with knowledge of Confidential Information; the existence and description of any technology or equipment, whether such description is in the form of written or oral descriptions, plans, drawings, demonstrations, or any other media; any research; any banking arrangement or relationship; any financial or other past, present or future transaction summary or description; any financial information; any agreement or contract; any other information concerning the business of the disclosing Contracting Party or any current or future business relationship between the Contracting Parties; any document or information of any type or description identified in writing by a Contracting Party to the other as confidential; or any report, memorandum, or other document or communication prepared by either Contracting Party or any Authorized Person which is based upon, refers to, summarizes or contains an evaluation of other Confidential Information.

f) "Covenant" shall mean the Non Disclosure – Non Circumvention Covenant.

g) "Disclose" shall mean disseminate, transmit, publish, post, distribute, make available, convey or otherwise make known.

h) "Equipment" shall mean the equipment listed in Exhibit "A".

i) "Joint Venture" shall mean the Arizona Precious Metals – Silver King Joint Venture.

j) "Media" shall mean any drawing, writing, diskette, hard drive, CD, or means whereby electronic data or writing of any kind and description is stored or from which such data or writing is reproducible.

SKM: _____

APM: _____

SKM – APM JVA
Page 2

Arizona Precious Metals – Silver King Joint Venture Agreement

k) "Person" shall mean a natural person, corporation, general partnership, limited partnership, trust, estate, limited liability company, association, organization or other entity of whatsoever nature or character.

l) "Silver King" shall mean Silver King Mining Company of Arizona, LLC, and Arizona Limited Liability Company;

m) "Silver King Mine" shall mean the Silver King Mine, the Mining Operations and the Unexplored Ore Bodies owned by Silver King in the environs of Superior, Arizona.

n) "Unexplored Ore Bodies" shall mean the ore or ores to which Silver King or its Affiliates has(ve) mining rights, located in the area of Superior, Arizona, consisting of 20 acres, more or less.

o) "Venture" or "Joint Venture" shall refer to APM and Silver King, and any successor(s) as may be designated and admitted to the Venture:

2) FORMATION, NAME, AND PRINCIPLE PLACE OF BUSINESS

a) The Venturers do hereby form a joint venture pursuant to the laws of the State of Arizona in order for the Venture to carry on the purposes for which provision is made herein. The Venturers shall execute such certificates as may be required by the laws of the State of Arizona or of any other state in order for the Venture to operate its business and shall do all other acts and things requisite for the continuation of the Venture as a joint venture pursuant to applicable law.

b) The Name and style under which the Venture shall be conducted is Arizona Precious Metals – Silver King Joint Venture.

c) The Venture shall maintain its principal place of business at the APM Plant 2244 N. 33rd Ave, Phoenix, Arizona, 85009-1432. The Venture may re-locate its office from time to time or have additional offices as the Venturers may determine.

3) PURPOSE

a) The purpose of the Venture shall be to mine the Silver King Mine and the Unexplored Ore Bodies, and to process and refine the same.

4) TERM

a) The term of the Venture shall commence as of the date hereof and shall be terminated and dissolved upon the earliest of: (i) the unanimous agreement of the Venturers; or (ii) the order of a court of competent jurisdiction.

5) CONTRIBUTIONS

a) APM Contributions To The Joint Venture shall be to arrange a loan in the amount sufficient to resume mining operations at the Silver King Mine of up to TEN MILLION DOLLARS ($10,000,000.00) to the Joint Venture. The parties recognize that APM shall obtain part financing from a third party, and acknowledge APM's right to make additional funding from the profits of the Silver King Mining operations allocated to APM pursuant to this Joint Venture Agreement. The parties specifically recognize that the term "up to TEN MILLION DOLLARS" does not mean

SKM-APM JVA
Page 3

Arizona Precious Metals – Silver King Joint Venture Agreement

"TEN MILLION DOLLARS", but that this amount is a limitation on APM's funding; however, APM guarantees that a minimum of TWO MILLION DOLLARS ($2,000,000.00) in total loans shall be made available to the Joint Venture.

i) **Funding:**

   (1) $350,000.00 on or before September 8, 2006 for initial startup;

   (2) The remainder of the loan(s) sufficient to continue mining operations shall be funded by third party funding or the profits of the mining operations allocated to APM as needed based on commercially reasonable standards, which the parties realize shall be the sole source of additional funding.

ii) **Loan Terms:**

   (1) Amount of Loan:  Up to TEN MILLION DOLLARS ($10,000,000.00).

   (2) Compound Interest Rate Per Annum:  10%

   (3) Term:  Five (5) years.

   (4) Repayment: Interest only after years 2, 3, and 4, with a balloon payment at the end of year 5, recapturing the interest from year 1.

   (5) Security:  The Joint Venturers agree to execute such security agreements in the property of the Joint Venture, including the equipment, mining rights and interests in the Silver King Mine, and Unexplored Ore Bodies, cash proceeds and bank accounts, present and future of the Joint Venture, as may be deemed necessary or required by the third party lender or APM.

   (6) Source of Repayment: The loan shall be repaid from the proceeds of the sales of the precious metals from the Silver King Mine and the Unexplored Ore Bodies.

b) Silver King Contributions To The Joint Venture shall be:

   i) The rights, title and interest in and to the Silver King Mine and the Unexplored Ore Bodies.

   ii) The rights, title and interest to the Equipment listed in Exhibit "A".

c) The Venturers' Capital Accounts shall not be credited with value as a result of the initial contributions.

d) The Venturers shall not be individually liable for the return of capital contributions or any part thereof, except as otherwise provided in this Joint Venture Agreement.

6) **CAPITAL CALLS**

a) Except as otherwise required by law or this Joint Venture Agreement, the Venturers shall not be required to make any further capital contributions in cash to the Venture unless otherwise agreed hereinafter.

SKM:

APM:

SKM – APM JVA
Page 4

Arizona Precious Metals – Silver King Joint Venture Agreement

7) **JOINT VENTURE INTERESTS**

   a) Upon execution of this Joint Venture Agreement, the Venturers shall each own the following interests in the Joint Venture:

      i) Silver King:   40%

      ii) APM:      60%

8) **ALLOCATIONS OF NET PROFITS, LOSSES AND DISTRIBUTIONS**

   a) The net profits, losses and distributions shall be treated by the Joint Venture in a manner that permits the highest net yield to each Joint Venturer, according to each Joint Venturer's ownership interest.

   b) The profits of the Joint Venture shall be allocated to the Joint Venturers immediately upon the showing of a profit of the Joint Venture. The profits allocated to APM may be used by APM as additional funding to the Joint Venture.

9) **OWNERSHIP OF PROPERTY IN KIND**

   a) The property and equipment purchased by the Joint Venture pursuant to the loan referenced in Paragraph 5(a) above shall be owned by the Joint Venture.

10) **PAYMENT FOR LOSSES AND INDEMNIFICATION**

   a) The Parties agree that in the event any losses arises out of or results from the performance of the business of the Joint Venture, each Venturer shall assume and pay the share of the losses that is equal to the percentage of participation exclusive of the payment on the Loan(s) .

   b) If for any reason, a Venturer sustains any liabilities or is required to pay any losses arising out of or directly connected with the business of the Joint Venture, or the execution of any surety bonds or indemnity agreements in connection therewith, which are in excess of its Percentage of Participation, in the Joint Venture, the other Venturer shall promptly reimburse such Venturer this excess, so that each and every member of the Joint Venturer will then have paid its proportionate share of such losses to the full extent of its Percentage of Participation.

   c) The Venturers agree to indemnify each other and to hold the other harmless from, any and all losses of the Joint Venture that are in excess of such other Venturer's Percentage of Participation. Provided that the provisions of this subsection shall be limited to losses that are directly connected with or arise out of the performance of the business of the Joint Venture and/or the execution of any bonds or indemnity agreements in connection therewith and shall not relate to or include any incidental, indirect or consequential losses that may be sustained or suffered by a Party.

   d) The Parties shall from time to time execute such bonds and indemnity agreements, including applications there and other documents that may be necessary in connection with the performance of the business of the Joint Venture. Provided however, that the liability of each of the Parties

SKM:

APM:

SKM – APM JVA
Page 5

under any agreement to indemnify a surety company or surety companies shall be limited to the percentage of the total liability assumed by all the Parties under such indemnity agreements that is equal to the Party's Percentage of Participation.

**11) POLICY COMMITTEE**

a) The management of the Joint Venture shall be conducted pursuant to policy established by the Parties acting through a "Policy Committee" which is hereby established. The Policy Committee shall be comprised of five (5) members. The Joint Venturers initially appoint the following members:

Silver King: Ronald R. Deen and Jack San Felice

APM:    Richard A. Campbell and Hans H Hueining

b) In addition to the designation of the representatives by each Joint Venturer, the Joint Venturers establish one permanent member of the Policy Committee. The Permanent Member shall act as a deadlock breaking member. The Joint Venturers recognize that the Permanent Member is the General Council to APM and is hereby appointed as the General Council for the Joint Venture. The parties recognize that a company owned by his wife is a minority member in APM. Permanent Member has no right to cast a vote on any proposal other than a proposal which is in deadlock. The Permanent Member cannot be replaced by agreement or otherwise; Permanent Member shall act in such capacity until his death or resignation. The Parties hereby acknowledge and waive and real, potential or imaginary conflict of interest arising from this appointment. The day to day operations shall not be conducted by the Policy Committee but by the Officers of the Joint Venture. The Joint Venturers agree to the following Permanent Member:

Permanent Member:  Peter Strojnik

c) Each Venturer may, at any time, substitute an alternative in place of any of its above-named representatives by serving written notice to the other. Each Venturer's representative on the Policy Committee is hereby granted and shall hereafter possess authority to act for such Venturer on all matters of interest to it with respect to its participation in the Joint Venture.

d) The Policy Committee shall determine the policy for the management of the Joint Venture by majority vote and, as used in this Joint Venture Agreement, the "majority vote" means three votes.

   (1) The Policy Committee shall have the following powers:

      (a) To determine the time and place of holding its meetings and the procedures for conducting Committee Affairs.

      (b) To determine and act upon the various matters, expressly or impliedly contained in other section of this Joint Venture Agreement, which require decision by the Policy Committee.

      (c) To determine and act upon any other matters of joint interest to, or requiring prompt action by the Joint Venture.

SKM: _RRD_
APM: _H_
    _PS_

Arizona Precious Metals – Silver King Joint Venture Agreement

    (d) To appoint Executive Offices for the Joint Venture, and to assign them such duties and to delegate to them such powers as they in their collective discretion deem advisable.

    (e) To determine distributions to Joint Venturers, however, the authorized distribution during the first year of operations shall not exceed 20% of each quarterly net profit of the Joint Venture.

e) The Policy Committee shall generally perform its duties at a meeting at which all designated representatives of the Parties are present, but where circumstances warrant, telephone communication between all party representatives or their alternatives is authorized.

f) The salaries and expenses of the Policy Committee shall be borne by the Party whom the representative has been designated to represent and shall not be an expense to the joint venture, except that the salary of the Permanent Member shall be paid by the Joint Venture.

g) The Policy Committee hereby makes the following appointments of Officers of the Joint Venture:

        CEO:   Richard A. Campbell

        CFO:   Hans H. Huening

        COO:   Jack San Felice

        Manager of Silver King Operations: Ronald R. Dean

h) These appointments shall remain in effect until the resignation or death of the appointee, or the removal of the appointee by the Policy Committee.

## 12) JOINT VENTURE BANK ACCOUNTS

a) All capital or other funds received by the Joint Venture in connection with its business shall be deposited in a checking account set up especially for the Joint Venture, and requiring the joint signatures of two Policy Committee members for any withdrawals, one by a Silver King appointed member, the other by an APM appointed member. Said accounts shall be kept separate and apart from any other accounts of the Venturers.

b) All working capital shall be deposited into a separate Joint Venture working capital checking account ("Joint Venture Working Capital Account"). Withdrawal of funds from the Joint Venture Working Capital Account shall be made in such amount and by such persons as authorized by the Policy Committee.

## 13) ACCOUNTING AND AUDITING

a) Separate books of accounts shall be kept by the CFO of the Joint Venture. Either Venturer may inspect such books upon reasonable notice and at any reasonable time.

b) Periodic audits may be made upon said books at such time as authorized by the Policy Committee by persons designated by the same and copies of said audit shall be furnished to all Venturers.

SKM: _____

APM: _____

                                  SKM – APM JVA
                                    Page 7

Arizona Precious Metals – Silver King Joint Venture Agreement

## 14) RESOLUTION OF DISPUTES

a) All disputes arising out of the Joint Venture Agreement between the Venturers that is not resolvable by good faith mediation by the same shall be filed in the United States District Court for the District of Arizona, or the Superior Court of the State of Arizona, at the election of the party seeking a resolution.

## 15) NON-DISCLOSURE/NON-CIRCUMVENTION COVENANT

a) This Covenant shall extend to and inure to the benefit of each of the Joint Venturers, their Representatives and Authorized Persons, as well as their respective successors and assigns.

b) In perpetuity, the Joint Venturers agree not to disclose any Confidential Information of any other Joint Venturer to any Person (other than Authorized Persons) or copy or duplicate any Confidential Information without the written consent of all Joint Venturers.

c) The Joint Venturers specifically agree in perpetuity not to utilize any Confidential Information of any other Joint Venture to engage in any commercial activity, which is competitive with the other Joint Venturers, directly or indirectly.

d) Each Joint Venturer hereby acknowledges that the ownership of Confidential Information and any derivatives thereof, provided by any other Joint Venturers shall remain with the Joint Venturer providing such Confidential Information and each Joint Venturer hereby waives any rights, title or interest in and to such Confidential Information.

## 16) OTHER PROVISIONS

a) Integration. This Joint Venture Agreement constitutes the entire agreement of the parties and may not be altered, unless the same is agreed upon in writing signed and acknowledged by the parties.

b) Binding Effect. This Joint Venture Agreement is binding upon the heirs, court appointed representatives, assigns, and successors of the parties.

c) Governing Law. This Joint Venture Agreement shall be governed by the laws of the state of Arizona.

d) Counterparts and the signatures. This Joint Venture Agreement may be signed in counterparts; facsimile signatures shall be deemed valid as originals.

e) English. The sections above are a part of this Joint Venture Agreement and constitute warranties and statements of fact and present intention.

f) Notices. All notices required or permitted to be given under this Agreement shall be in writing and will be deemed effectively given upon personal delivery or two (2) days after deposit with a recognized overnight courier service with tracking capability (e.g. Federal Express or DHL), to the Party to be notified at the following address:

SKM — APM JVA
Page 8

Arizona Precious Metals – Silver King Joint Venture Agreement

|  |  |
|---|---|
| If to Silver King: | Ronald R. Dean<br>56389 Simmons Way<br>Kearney, AZ 85237 |
| With a copy to: | Jack San Felice<br>6237 E. Mallory St.<br>Mesa, AZ 85215-2116 |
| If to APM: | Richard Campbell<br>8686 West Morten Avenue<br>Glendale, Arizona 85305 |
| With a copy to: | Peter Strojnik<br>PETER STROJNIK, P.C.<br>3030 N. Central Avenue, Suite 1401<br>Phoenix, Arizona 85012 |

g) **Injunctive Relief.** The breach of this Agreement will cause irreparable harm to the aggrieved Joint Venturer, and in addition to any and all other remedies at law and equity, the Joint Venturers agree that injunctive relief is appropriate to protect the aggrieved Joint Venturer upon the showing of any breach hereof. Such injunctive relief shall be as determined by the Court of competent jurisdiction but the Joint Venturers agree to the issuance of such injunctive relief *ex parte* unless precluded specifically by applicable statute.

h) **No Waiver.** The Joint Venturers, in addition to the specific remedies set forth herein, shall retain all causes in law and equity for a default hereunder, and the failure to act upon any default shall not be deemed a waiver thereof for any purpose.

i) **Inference.** This Agreement has been prepared for the benefit of all Joint Venturers and no inference shall be made that any Joint Venturer prepared this Agreement and no inferences are to be drawn against any Joint Venturer upon the basis that this Agreement was prepared by one Joint Venturer or the other.

j) **Cooperation.** The parties will reasonably cooperate with one another in connection with each other's performance. The parties acknowledge that such performance depends in part on such cooperation and that the failure to cooperate may hinder or impede the other's performance hereunder.

k) **Force Majeure.** If the performance of either party is delayed or prevented at any time due to circumstances beyond its control, including, without limitation, those resulting from labor disputes, fire, floods, riots, civil disturbances, weather conditions, control exercised by a governmental entity, unavoidable casualties or acts of God or a public enemy, performance will be excused until such condition no longer exists.

l) **English Version.** This Agreement shall be effective only in its English version, although any Joint Venturer may for convenience have this Agreement translated into any language. Any difference

SKM: *[signature]*

APM: *[signature]*

PS

SKM – APM JVA
Page 9

Arizona Precious Metals – Silver King Joint Venture Agreement

between the English version and any other version shall be conclusively reconciled in favor of the English version.

m) **No Recruitment of Employees.** To the maximum extent permitted by law, neither party will solicit any employee of the other party for employment for a period of eighteen (18) months after the termination of this Agreement.

EXECUTED on the date first hereinabove written.

Silver King Mining Company of Arizona, LLC          Arizona Precious Metals, Inc.

8/22/06

accepted By

8/22/06

SKM:

APM:

SKM – APM JVA
Page 10

Arizona Precious Metals – Silver King Joint Venture Agreement

**EXHIBIT "A"**
List of Equipment

**Underground mining equipment**
    One (1) Vulcan/Denver Hoist; 600 feet of ¾ inch steel cable; 26-ton pull capacity.
    One (1) Standard Skip-Jack ore lift; bucket, 4 ft x 4 ft.
    One (1) Standard steel Man-Cage elevator; 4 ft x 4 ft x 8 ft.
    One (1) Standard fabricated steel Ore Bin; 50 ton capacity.
    Two- (2) Standard underground steel Ore-Carts.
    Two (2) Ingersoll-Rand Double-Drum Slushers.
    Two (2) Cavo Mechanical Mine Muckers.
    Six (6) Denver Jacking Model # 83 Air Hammers.
    Two (2) Standard Ore Buckets.
    Two (2) Denver Underground Stoppers.
    Two (2) Standard Pneumatic Air Tuggers.
    One (1) Ingersoll Pneumatic Air Tugger.

**Crushing Equipment**
    One (1) Marko Conveyer belt system, 30 inch x 70 ft.
    One (1) Standard fabricated steel Ore hopper; 25 ton capacity.
    One (1) Pioneer Jaw Crusher; 10 inch X 20 inch.
    One (1) Allis Chalmers Jaw Crusher, 22 inch Reduction Crusher.
    One (1) Standard fabricated steel surge bin; 3 ft x 6 ft x 4 ft.
    One (1) Marko Conveyer belt system, 30 inch x 60 ft.
    One (1) Allis Chalmers double stack metal ore screen; 6 ft x 3 ft.

**Ball Mill Equipment**
    One (1) Standard fabricated steel Ore hopper; 8 ft x 12 ft; 25 ton.
    One (1) Marko Conveyer belt system, 18 inch x 20 ft.
    One (1) Hardy Ball Mill ore crushing system, 6 ft x 2 ft interior workings.

**Milling facilities Equipment**
    Three (3) Cyclone feed pumps.
    One (1) Standard Sump pump.
    One (1) Chemical Conditioning tank.
    One (1) Denver Concentrator Float Cell system, 2000 gallon capacity.
    One (1) Thickener tank; 2600 gallon capacity; 6 ft x 8 ft.
    One (1) Denver Belt Filter Plant; 1 ft x 3 ft.
    One (1) Dyster Ore Concentrating Shaker Table.
    Ore fabricated steel drying container; 10 ft x 6 ft.

**Support Equipment**
    One (1) Steel Diesel fuel tank, 2000 gallon capacity, double wall.
    One (1) Steel Shower water tank.
    One (1) large 250-Kilowatt CAT Diesel Generator.
    One (1) Allis Chalmer # 65 KWA Small generator.
    One (1) Small Standard Aux. Generator.
    Two (2) Atlas & Worthington Diesel Compressors.
    Four (4) Standard electrical transformers.

SKM: _(signature)_
APM: _(signature)_

SKM – APM JVA
Page 11

Arizona Precious Metals – Silver King Joint Venture Agreement

**Vehicles**

One (1) Allis Chalmers HDZ1A Bulldozer.
One (1) Ford F-700 Boom Truck.
One (1) Bobcat Loader.

**END**

SKM: _Zilla._
APM: _H_

SKM – APM JVA
Page 12

© Strojnik 2006

## LOAN AGREEMENT

This Loan Agreement is made effective the 5th day of September, 2006 by and between Arizona Precious Metals, Inc., a Nevada company ("APM"); and Accept Erste Rohstoff Beteiligungs KG, a German Limited Partnership ("Accept"). APM and Accept are sometimes collectively hereinafter referenced as "Parties" or separately as a "Party".

### W I T N E S S E T H:

WHEREAS, APM is a duly formed corporation pursuant to the laws of the State of Nevada; and

WHEREAS, APM is presently engaged in active negotiation with several prospective joint venturers relative to mining and refining operations, including (1) the Silver King and the El Medico mining claims owned by Silver King of Arizona Mining Company ("SKM") in Superior, Arizona; (2) Black Sand Concentrations and Zircon Production at Guinea/West Africa owned/operated by American Guinea Mining Corporation; and (3) the El Colomo mine owned by Golden Anvil S.A. de CV of Tepic, Nayarit, Mexico; and

WHEREAS APM has in the meantime concluded a Joint Venture Agreement dated August 22, 2006 with SKM, and

WHEREAS, APM has an Letter of Intend (LOI) in place with New Verde River Mining Co, Inc. to purchase its Phoenix Recovery Plant (including all machinery and equipment, laboratory, permits, proprietary technology); and

WHEREAS, Accept wishes to make a Loan to APM in the amount and on the schedule set forth below; and

WHEREAS, Accept has had an opportunity to ask any questions about APM and its business, which questions have been fully and completely answered by APM.

NOW, THEREFORE, in consideration of the mutual promises of the parties, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

### AGREEMENT

**1) DEFINITIONS.**

a) **"Accept"** shall mean the Accept Erste Rohstoff Beteiligungs KG, a corporation duly organized under the laws of the Country of Germany.

b) **"APM"** shall mean Arizona Precious Metals, Inc, a Nevada corporation.

c) **"Authorized Persons"** shall mean those directors, officers, managers, agents, or independent consultants of any Contracting Party who are authorized by such Contracting Party to obtain Confidential Information in order to evaluate a prospective business relationship or to carry out any business relationship which may be established by or among the Contracting Parties.

d) **"Confidential Information"** shall mean any and all information concerning, related to, or referencing any business relationship currently existing or contemplated by any Contracting Party; any client or customer relationship including the identity of such client or customer, any customer or client list, and any customer or client information; the identity of any Person with knowledge of Confidential Information; the existence and description of any technology or equipment, whether such description is in the form of written or oral

Accept: [signature]

APM: [signature]

Accept – APM Loan Agreement
Page 1

# EXHIBIT 2

descriptions, plans, drawings, demonstrations, or any other media; any research; any banking arrangement or relationship; any financial or other past, present or future transaction summary or description; any financial information; any agreement or contract; any other information concerning the business of the disclosing Contracting Party or any current or future business relationship between the Contracting Parties; any document or information of any type or description identified in writing by a Contracting Party to the other as confidential; or any report, memorandum, or other document or communication prepared by either Contracting Party or any Authorized Person which is based upon, refers to, summarizes or contains an evaluation of other Confidential Information.

e) **"Covenant"** shall mean the Non Disclosure – Non Circumvention Covenant.

f) **"Disclose"** shall mean disseminate, transmit, publish, post, distribute, make available, convey or otherwise make known.

g) **"GAAP"** shall mean Generally Accepted Accounting Practices.

h) **"Golden Anvil Project"** shall mean the Project relating to the El Colomo mine owned by Golden Anvil S.A. de CV of Tepic, Nayarit, Mexico.

i) **"Guinea Project"** shall mean the Project relating to Black Sand Concentrations and Zircon Production at Guinea/West Africa owned/operated by American Guinea Mining Corporation.

j) **"Loan"** shall mean the loan contemplated herein.

k) **"Media"** shall mean any drawing, writing, diskette, hard drive, CD, or means whereby electronic data or writing of any kind and description is stored or from which such data or writing is reproducible.

l) **"Person"** shall mean a natural person, corporation, general partnership, limited partnership, trust, estate, limited liability company, association, organization or other entity of whatsoever nature or character.

m) **"Project"** shall mean individual endeavor of APM.

n) **"Representatives"** shall mean any Person who is a shareholder, director, officer, employee, agent, professional representative including attorneys or accountants, and any Person holding equity in, retained by, employed by or commissioned by a Contracting Party.

o) **"Silver King Project"** shall mean the Project relating to the Silver King and the El Medico mining claims owned by Silver King of Arizona Mining Company in Superior, Arizona

## 2) RECITALS AS WARRANTIES:

a) <u>Recitals</u>: The Parties agree that the recitals above are recitals of fact and their present intent, and that they represent warranties of fact and present intent for the purposes of this Agreement.

## 3) LOAN AND FUNDING:

a) <u>Promise To Make A Loan</u>: Accept hereby promises, covenants and agrees to make a Loan to APM in the amount of TWO MILLION US DOLLARS ($2,000,000.00), funded and payable in Loan installment payments as follows:

i) $300,000 allocated to the Silver King Mine Project on or before August 31, 2006;

Accept: 
APM:

Accept – APM Loan Agreement
Page 2

© Strojnik 2006

   ii) $200,000 allocated to the Silver King Mine Project on or before September 30, 2006;

   iii) $200,000 allocated to the Guinea Project on or before August 31, 2006;

   iv) $200,000 allocated to the Guinea Project within 30 days of the execution of this Agreement;

   v) $100,000 allocated to the Guinea Project within 60 days of the execution of this Agreement;

   vi) $100,000 allocated to the Golden Anvil Project on or before August 31, 2006;

   vii) $300,000 allocated to the Golden Anvil Project on or before September 30, 2006;

   viii) $400,000 allocated to the Golden Anvil Project on or before December 31, 2006

   ix) $100,000 allocated to Working Capital on or before August 31, 2006;

   x) $100,000 allocated to Working Capital on of before September 30, 2006.

b) <u>The Use Of Loan Proceeds</u>: The Loan proceeds shall be used as indicated in Paragraph 3(a)(i – x), except that if, in the exercise of a good faith business judgment, APM determines that the Loan proceeds should be reallocated to other Project or Projects. In the event APM determines, in the exercise of its good faith business judgment, that the Loan proceeds should be reallocated to other Project of Projects, APM shall so advise Accept. The term "good faith business judgment" as used in this paragraph shall mean, at the minimum, that the reallocation of the Loan proceeds shall not impair the rights of Accept pursuant to this Loan Agreement or otherwise diminish the capacity of APM to make repayment as herein specified.

c) <u>Interest Rate:</u> APM shall pay simple annual interest rate of TEN PERCENT (10%) on all amounts from the date of the funding until paid in full. The interest is payable within 30 days after December 31st of each year, except for the first year 2006, which interest payment is due at the end of year five or when APM makes its final payment pursuant to the Prepayment Clause in paragraph 3(g) below.

d) <u>Security:</u> The Loan shall be secured as set forth in the Security Agreement of even date.

e) <u>Guarantees:</u> The Loan is not guaranteed.

f) <u>Repayment Schedule:</u> The Loan has a term of 5 years until December 31, 2011

g) <u>Prepayment:</u> APM has the right to prepay any part or all of the principal or interest at any time with a prepayment penalty of 10 % of the outstanding principal balance  Any and all payments shall be first applied to interest and thereafter to principal.

## 4) ACCOUNTING AND REVIEW.

a) <u>Accounting.</u> Upon receipt of the Loan funds by APM from Accept, APM shall make quarterly accounting of use of Loan proceeds available to Accept, using GAAP.

b) <u>Allocation And Allocation Accounting</u>: Upon repayment of the Loan or any part thereof, APM shall specify (1) the Loan installment to which the repayment applies; (2) the nature of the repayment, i.e., whether it shall apply to interest, to principal, or both, except that in all instances shall payment be first applied toward interest; and (2) the remaining principal and interest balance on the installment.

Accept: _____

APM: _____

c) Review: Accept shall have the right to review, upon thirty (30) day written notice, the books and records of APM which books and records shall contain internal accounting, operations, and the status of various Projects.

## 5) REPRESENTATIONS AND WARRANTIES OF ACCEPT.

a) Accept has not relied on any written or verbal information provided by APM, but has decided to make this Loan solely upon its own understanding of the mining and refining industry. No oral representations have been made or oral information furnished to Accept in connection with the Loan, which were in any way inconsistent with its understanding of the industry; and Accept has had a reasonable opportunity to ask questions and receive answers from APM concerning the Loan, but have asked none.

b) Accept is authorized to make this Loan by its charter, articles, by-laws or similar authoritative documents as may be applicable to its charter and operations.

c) The Loan Funds arise from fully legal transactions and shall not transmitted to APM for the purpose of evasion of any obligation of Accept.

d) All Loan Funds are clear of any and all liens, claims and encumbrances of every kind and description and are not subject to forfeiture, either civil or criminal, to any jurisdiction. The transfer of such funds to APM does not violate the provisions of any ruling, order, regulation, or any applicable provision of Federal, State or local law, or any foreign law otherwise applicable to Accept.

e) No specifically designated national blocked person, entity, group or embargoed country, State, Nation or entity, as recognized by the Government of the United States, is now, or may hereinafter benefit from this Loan Agreement, and no benefit shall flow in any way to any country, State, Nation or entity or any person, entity or group or persons or entities engaged directly or indirectly, or intending directly or indirectly to engage, in international terrorism, the financing of international terrorism, money laundering or any other activity deemed unlawful by the United States or of any other government or jurisdiction.

f) The person whose signature appears below on behalf of Accept is duly authorized to bind Accept to the terms of this Loan Agreement.

## 6) WARRANTIES AND REPRESENTATIONS OF APM.

a) APM hereby warrants and represents the following:

i) APM is a corporation duly organized and validly existing under the laws of the State of Nevada, United States of America.

ii) The execution of this Loan Agreement shall not violate any law, regulation or rule of any applicable jurisdiction or any judgment or order of any court, agency, or administrative body of which APM is aware.

iii) The person signing below on behalf of APM is fully authorized to bind APM hereto.

iv) The execution of this Agreement will not violate any law, regulation or rule of any applicable jurisdiction or any judgment or order of any court, agency, or administrative body to which APM is subject.

Accept: _____
APM: _____

Accept – APM Loan Agreement
Page 4

© Strojnik 2006

## 7) NON DISCLOSURE NON CIRCUMVENTION COVENANT.

a)  This Covenant shall extend to and inure to the benefit of each of the Contracting Parties, their Representatives and Authorized Persons, as well as their respective successors and assigns. This Covenant is not assignable without the express written consent of all Contracting Parties. The provisions of this Covenant shall be considered Confidential Information and shall not be disclosed except as provided herein or upon the written consent of all Contracting Parties.

b)  The Contracting Party disclosing any Confidential Information to any Authorized Person shall first identify such person to the other Contracting Parties and shall make no disclosure without the specific written consent of all other Contracting Parties and execution by the Authorized Person of an acknowledgement, in form and substance satisfactory to all Contracting Parties, that such Authorized Person is bound by the terms hereof. By disclosing Confidential Information to any Person, each Contracting Party agrees that such Person shall be bound by this Agreement, either as a successor or assign or by separate agreement, and the Contracting Party disclosing Confidential Information to any Authorized Person or Persons shall be fully liable for any damage resulting from disclosure of the Confidential Information by such Authorized Person.

c)  For a period of five (5) years after the date of receipt of Confidential Information each Contracting Party agrees that it shall not Disclose such Confidential Information to any Person who is not an Authorized Person. Each Contracting Party shall limit the Authorized Persons receiving Confidential Information to those Persons who are necessary to evaluate the Confidential Information for the sole purpose of evaluating the possible business relationship between the Contracting Parties and those Persons who are necessary to conduct or transact any business activity in which the Contracting Parties have agreed to engage.

d)  In perpetuity, the Contracting Parties agree not to disclose any Confidential Information of any other Contracting Party to any Person (other than Authorized Persons) or copy or duplicate any Confidential Information without the written consent of all Contracting Parties.

e)  The Contracting Parties specifically agree in perpetuity not to utilize any Confidential Information of any other Contracting Party to engage in any commercial activity, which is competitive with the other Contracting Parties, directly or indirectly. The Contracting Parties further agree to take all necessary steps to assure that no Authorized Person or Representative in any way utilizes Confidential Information to engage in any activity, directly or indirectly, which is competitive with any other Contracting Party.

f)  In perpetuity, except for times that the Confidential Information is actually being reviewed or utilized to evaluate, conduct or engage in a business transaction in which the Contracting Parties have agreed to engage, the Contracting Parties shall keep any media upon which Confidential Information is reflected, recorded, or displayed in a confined and locked environment and in an environment reasonably inAcceptible to Persons (other than Authorized Persons).

g)  Each Contracting Party hereby acknowledges that the ownership of Confidential Information and any derivative thereof provided by any other Contracting Parties shall remain with the Contracting Party providing such Confidential Information and each Contracting Party hereby waives any rights, title or interest in and to such Confidential Information.

h)  If at any time any Contracting Party, in its sole discretion with or without cause, determines to terminate evaluation of a potential business relationship with the other Contracting Parties, notice shall immediately be given to all other Contracting Parties in writing. Within ten (10) days of receipt of such notice, all Media containing any Confidential Information shall be returned by all Contracting Parties to the owner of

Accept: _____
APM: _____

Accept – APM Loan Agreement
Page 5

© Strojnik 2006

such Confidential Information and any copies destroyed whether in the possession of a Contracting Party or its Authorized Persons or Representatives. Notwithstanding the return or destruction of the Confidential Information in the possession of a Contracting Party, its Authorized Persons or its Representatives, the obligations of confidentiality and security hereunder shall continue in accordance with the provisions of this Agreement.

## 8) MISCELLANEOUS.

a) <u>Entire Agreement.</u> This Loan Agreement and the documents referenced herein are to be considered the entire agreement of the Parties and shall supersede all prior agreements and representations, written or oral. If any part of this Agreement or the referenced documents is deemed unenforceable or illegal, the remaining provisions shall be interpreted as consistently as possible with the intent of the Parties as set forth herein.

b) <u>Construction.</u> This Loan Agreement shall be construed in accordance with the laws of the State of Arizona. Jurisdiction to resolve any dispute arising hereunder shall be proper only in the Federal District Court For The District Of Arizona, if such Court has subject matter jurisdiction, and otherwise in the courts of competent jurisdiction located in Maricopa County, Arizona. All Contracting Parties hereby consent to the personal jurisdiction of such Courts and waive any claim of lack of personal jurisdiction or venue in any suit brought hereunder by any other Contracting Party in such Courts.

c) <u>Notices.</u> All notices required or permitted to be given under this Agreement shall be in writing and will be deemed effectively given upon personal delivery or two (2) days after deposit with a recognized overnight courier service with tracking capability (e.g. Federal Express or DHL) to the Party to be notified at the following address:

If to Accept:

                Accept Erste Rohstoff Beteiligungs KG
                Heerstr.24-26,
                D 14052 Berlin, Germany
                Attention: Bernhard Puttke

With a copy to:

                Karl-Heinz Rauball
                Heerstr. 24-26
                D 14052 Berlin, Germany

If to APM:

                Richard Campbell
                8686 West Morten Avenue
                Glendale, Arizona 85305

With a copy to:

                Peter Strojnik
                PETER STROJNIK, P.C.
                3030 N. Central Avenue, Suite 1401
                Phoenix, Arizona 85012

Accept:

APM:

© Strojnik 2006

d) <u>Injunctive Relief.</u> The breach of this Agreement will cause irreparable harm to the aggrieved Contracting Party, and in addition to any and all other remedies at law and equity, the Contracting Parties agree that injunctive relief is appropriate to protect the aggrieved Contracting Party upon the showing of any breach hereof. Such injunctive relief shall be as determined by the Court of competent jurisdiction but the Contracting Parties agree to the issuance of such injunctive relief *ex parte* unless precluded specifically by applicable statute.

e) <u>No Waiver.</u> The Contracting Parties, in addition to the specific remedies set forth herein, shall retain all causes in law and equity for a default hereunder, and the failure to act upon any default shall not be deemed a waiver thereof for any purpose.

f) <u>Inference.</u> This Agreement has been prepared for the benefit of all Contracting Parties and no inference shall be made that any Contracting Party prepared this Agreement and no inferences are to be drawn against any Contracting Party upon the basis that this Agreement was prepared by one Contracting Party or the other.

g) <u>Cooperation.</u> The parties will reasonably cooperate with one another in connection with each other's performance. The parties acknowledge that such performance depends in part on such cooperation and that the failure to cooperate may hinder or impede the other's performance hereunder.

h) <u>Force Majeure.</u> If the performance of either party is delayed or prevented at any time due to circumstances beyond its control, including, without limitation, those resulting from labor disputes, fire, floods, riots, civil disturbances, weather conditions, control exercised by a governmental entity, unavoidable casualties or acts of God or a public enemy, performance will be excused until such condition no longer exists.

i) <u>English Version.</u> This Agreement shall be effective only in its English version, although any Contracting Party may for convenience have this Agreement translated into any language. Any difference between the English version and any other version shall be conclusively reconciled in favor of the English version.

j) <u>No Recruitment of Employees.</u> To the maximum extent permitted by law, neither party will solicit any employee of the other party for employment for a period of eighteen (18) months after the termination of this Agreement.

k) <u>Counterparts; Faxed Signatures.</u> This Agreement may be executed in counterpart and facsimile signatures shall be treated as originals.

l) <u>Benefit; Other Entities.</u> This Agreement shall inure to the benefit of the Parties hereto and their respective successors and assigns.

Executed effective as of the date above first written.

ACCEPT
**ACCESS Erste Rohstoff Beteiligungs KG**

By: ~~Kurt Schaller~~ BERNHARD PUTTKE
Authorized Representative

**ARIZONA PRECIOUS METALS,INC.**

By: Dr. Hans (John) Huening
Authorized Representative

ACCEPT
Access: ~~Access:~~ Bep

APM:

ACCEPT
~~Access~~ – APM Loan Agreement
Page 7